NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

───────────────────

BARBARA KOSKOVICH,
*Plaintiff/Appellant*,

v.

SCOTTSDALE HEALTHCARE HOSPITALS, et al.,
*Defendants/Appellees*.

No. 1 CA-CV 20-0371
FILED 3-23-2021

───────────────────

Appeal from the Superior Court in Maricopa County
No. CV2017-053016
The Honorable Theodore Campagnolo, Judge

**AFFIRMED**

───────────────────

COUNSEL

Jeffrey L. Victor, PC, Scottsdale
By Jeffrey L. Victor
*Counsel for Plaintiff/Appellant*

Broening Oberg Woods & Wilson, PC, Phoenix
By James R. Broening, Megan E. Gailey, Kelley M. Jancaitis
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge David B. Gass and Judge Michael J. Brown joined.

---

**W E I N Z W E I G**, Judge:

**¶1** Barbara Koskovich ("Plaintiff") appeals the superior court's entry of summary judgment for Defendant Scottsdale Healthcare Hospitals dba HonorHealth John C. Lincoln Deer Valley Hospital (the "Hospital"). For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

**¶2** Donald Koskovich ("Donald") was admitted to the Hospital for hernia repair surgery on September 25, 2015. Dr. Jamison Foster performed the surgery without "immediate" complication, noting that Donald would "be kept for pain control and bowel function." Donald was moved to the post-anesthesia unit in stable condition and later to a hospital room, where he remained until his death on October 1. Between his admission and death, at least four doctors visited Donald, including Dr. Foster and an independent hospitalist physician, Dr. Andres Reyes.

**¶3** Donald experienced nausea and vomiting on September 29 and September 30. Just after 8:00 p.m. on September 30, Donald vomited approximately 400 ccs of green bile. His attending nurse ("Nurse A") informed Dr. Foster. An abdominal x-ray was performed, which showed that Donald had developed a "small bowel ileus versus partial/early small bowel obstruction." Later that evening, Nurse A relayed Donald's x-ray results to Dr. Foster.

**¶4** Plaintiff is Donald's wife. She visited Donald the next day, October 1, when a different nurse ("Nurse B") was attending to Donald. At around 11:00 a.m., Plaintiff told Nurse B that Donald was "becoming significantly more confused." Nurse B promptly informed Dr. Reyes. As Nurse B described in her progress note:

> This RN spoke with Dr. Reyes re: [patient]'s increasing confusion, also relayed wife's concerns about [patient] "becoming significantly more confused than he has been[,]" making noncoherent comments and grabbing at objects that

2

are not there.  Dr. Reyes had not yet seen [patient], was about
to go into [patient]'s room.

Dr. Reyes responded and examined Donald.

**¶5**        A few hours later, at 3:10 p.m., Donald's bed alarm sounded.
The first person to respond was Dr. Foster who found Donald "sitting on
[the] bed and fresh blood on his gown and sheets after having just pulled
his IV out."  Donald recognized Dr. Foster and remembered undergoing
surgery.  Dr. Foster ordered a safety camera for Donald's room and
discussed the need for a "sitter."

**¶6**        Around ten minutes later, a respiratory therapist examined
Donald and noted the "coarse crackles throughout" his breath.  The
respiratory therapist spoke to Dr. Reyes and informed Nurse B that
Donald's breathing "continues to be coarse."  Dr. Reyes ordered chest x-
rays.  At 3:30 p.m., Nurse B described Donald as "resting" with "eyes
closed" and audible "coarse breath sounds."

**¶7**        The x-ray technician soon arrived at Donald's room and
found Donald unresponsive with vomit "all over the place."  Donald had
gone into cardiac arrest.  He was not breathing and had no pulse.  An
emergency code (code blue) was called at about 3:45 p.m.  The critical care
team responded, including an emergency room physician.  They
unsuccessfully tried to revive Donald with medications (epinephrine,
atropine and intravenous sodium bicarbonate) and almost 30 minutes of
CPR.  Donald was pronounced dead at 4:13 p.m.  An autopsy was
conducted on October 8, which determined that Donald died from
aspiration of gastric contents.

**¶8**        Plaintiff filed this wrongful death action against the Hospital,
Dr. Foster and other defendants in April 2017.  As against the Hospital,
Plaintiff alleged its "medical health care professionals" breached their duty
of care and "directly and proximately" caused Donald's death.

**¶9**        Plaintiff disclosed several expert witnesses, including Dr.
Gary Salzman and Lisa Mancuso, RN.  Dr. Salzman was the only witness
disclosed for causation, but he offered an opinion on the standard of care,
which was that on September 29 the Hospital's "health care providers"
should have inserted a nasogastric tube into Donald's stomach and ordered
that Donald not receive food or drink by mouth.  Dr. Salzman offered no
opinion on the rapid response team's role or whether Nurse B should have
summoned the rapid response team instead of Dr. Reyes on October 1.

¶10        Ms. Mancuso was retained to offer an opinion about the standard of care for hospital nurses.  She concluded that Nurse B breached the relevant standard of care by failing to "escalate the level of care . . . [a]s soon as the patient was not responding to therapy."  Although recognizing "it's not black and white," Ms. Mancuso felt that Nurse B should have called for "a rapid response" on the morning or early afternoon of October 1, specifically at around 11:00 a.m., when Plaintiff raised concern about Donald's cognitive functioning, or by 2:50 p.m. that afternoon at the latest.  At her deposition, Ms. Mancuso testified:

> A rapid response is a way to bring emergency medical personnel to the patient's bedside.  And the purpose of a rapid response is to intervene before there is a death, a cardiac arrest or a code blue, whatever term you use. . . . And so a rapid response is all of those things that brings respiratory therapy, it might bring anesthesia, it's going to bring the critical care team, to the patient's bedside to help figure out what's going on and timely treat the patient.

¶11        After discovery, the Hospital filed two motions for summary judgment.  The first motion sought summary judgment on punitive damages, which the court denied.  The second motion requested summary judgment on causation.  The Hospital argued that Plaintiff could not show causation because she had "not disclosed any expert opinion providing that the nurses' medical care was a cause of" Koskovich's death.

¶12        The superior court heard oral argument and granted summary judgment, holding that Plaintiff "ha[d] not presented prima facie evidence [showing] that there [was] a genuine issue of material fact in regards to the . . . nursing staff at [Hospital] and the [issue of causation]."  The court also recognized that Plaintiff needed to prove causation through an expert witness because a reasonable juror lacks the knowledge and understanding to connect Donald's death and Nurse B's failure to summon the rapid response team.  Plaintiff unsuccessfully moved for reconsideration.

¶13        Plaintiff timely appealed.  We have jurisdiction.  *See* A.R.S. § 12-2101(A)(1).

## DISCUSSION

¶14        Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Ariz. R. Civ. P. 56(a).  "We review de novo a grant of

4

summary judgment, viewing the evidence and reasonable inferences in the light most favorable to the party opposing the motion." *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003). A moving party is entitled to summary judgment "if the facts produced in support of the [nonmovant's] claim or defense have so little probative value" that "reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Id.* ¶ 13 (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990)).

## I.     Medical Malpractice and Causation

**¶15**          To prove medical negligence, a plaintiff must provide evidence that the defendant failed to meet the applicable professional standard of care and defendant's failure proximately caused plaintiff's injuries. A.R.S. § 12-563. To establish proximate cause, the plaintiff must show "a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred." *Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 11 (App. 2004).

**¶16**          A plaintiff must show that causation is probable, not merely speculative, *see Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990), and the defendant's negligence must be "a substantial factor in bringing about the harm," *Thompson v. Better-Bilt Aluminum Prod. Co.*, 171 Ariz. 550, 554 (1992) (quoting Restatement (Second) of Torts § 431(a) (1965)).

**¶17**          Plaintiff suggests her medical negligence claim against the Hospital did not require an expert witness to prove causation. We disagree. Causation in medical malpractice actions must be proven by "expert medical testimony" unless the connection between the conduct and the injury is "readily apparent to the trier of fact." *Barrett*, 207 Ariz. at 378, ¶ 12. A medical expert's testimony was required to show causation here because an average juror is unlikely to understand the causal relationship between Donald's death and Nurse B calling the hospitalist physician instead of the rapid response team. *E.g.*, *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54 (App. 1985). Without expert guidance, a jury could only speculate about what might have been. *Lohse v. Faultner*, 176 Ariz. 253, 263 (App. 1992) ("[I]t was wholly speculative whether [defendant's] agents, in the absence of negligence, would have been positioned to prevent harm."). Summary judgment is appropriate if the plaintiff fails to provide the requisite expert opinion evidence as to causation. *See Gorney v. Meaney*, 214 Ariz. 226, 232, ¶ 20 (App. 2007).

¶18        Plaintiff contends the superior court erroneously granted summary judgment because a reasonable nurse would have sounded the rapid response alarm just after 11:00 a.m. on October 1, and "sufficient expert evidence was presented for a jury to reasonably infer causation from [the Hospital's] nursing staff's failure to timely call a Rapid Response causing immediate medical intervention into [Donald's] seriously declining condition in order to save his life."  But that misstates the inquiry.  The undisputed record at summary judgment reveals that Nurse B contacted Dr. Reyes—the hospitalist physician—just after 11:00 a.m. and shared Plaintiff's concern about Donald's cognitive functioning.  Dr. Reyes promptly responded and he examined Donald.  To defeat summary judgment, therefore, Plaintiff needed to present expert testimony and evidence that Donald died because Nurse B contacted the hospital physician instead of the rapid response team.

¶19        And, on that point, Plaintiff's expert witnesses never explain how or why Nurse B's call to the hospitalist physician as opposed to the rapid response team was the difference between life and death.  Plaintiff provides no evidence on the most basic facts to establish this connection. For instance, she provides no evidence on the Hospital's rapid response policy and procedure; the names and background of medical professionals and physician specialists who staffed the Hospital's rapid response team and would have responded on October 1; how the training and experience of those medical professionals differ from a hospitalist physician's training and experience; whether and how often the Hospital's rapid response team had been summoned to similar emergencies and diagnosed the patient's condition; or whether those medical professionals would have ordered a different course of treatment—meaning a nasal gastric tube and more dietary restrictions—than a hospitalist physician.

¶20        Plaintiff counters with several arguments.  She first contends that causation is a jury question in "medical malpractice loss of chance case[s]" when evidence shows that the defendant's negligence increased the risk of injury, citing *Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597 (1984).  We disagree for two independent reasons.  Plaintiff has not shown that "loss of chance" causation applies to this case.  Unlike in *Thompson*, where the hospital defendant transferred a patient to another hospital and thus delayed critical surgery, Plaintiff did not present evidence showing that Nurse B "undertook to protect [Donald] from a particular harm and negligently interrupted the chain of events," thus increasing Donald's risk of harm.  *Id.* at 615-16.  Plaintiff only contends that Nurse B should have called the rapid response team, presumably instead of the hospitalist physician.

**¶21**         Even under *Thompson*, however, Plaintiff has not provided evidence that "the defendant's negligence increased the risk of harm or deprived plaintiff of some significant chance of survival or better recovery," *id.* at 614, and certainly not enough evidence to "rise to the level of substantiality," *Lohse*, 176 Ariz. at 263.

**¶22**         Plaintiff also relies on a recent Maryland Court of Special Appeals opinion, *Adventist Healthcare Inc. v. Mattingly*, 223 A.3d 1025 (Md. Ct. Spec. App. 2020), but her reliance is misplaced.  There, the plaintiff claimed a hospital nurse "was negligent for failing to escalate the issue" under the hospital's "Chain of Command Policy" after the treating physician "failed to respond to multiple telephone calls . . . while [the patient] became progressively more ill."  *Id.* at 262-63, 284.  Here, Nurse B immediately contacted the hospitalist physician who then responded, and the record includes no evidence of any hospital policies.

**¶23**         Plaintiff further contends that summary judgment was improper because the Hospital presented no evidence that the rapid response team "would not have saved [Donald]."  But Plaintiff bears the ultimate burden to prove her tort claim at trial, and the Hospital "does not need to present evidence disproving the non-moving party's claim." *Nat'l Bank of Ariz. v. Thruston*, 218 Ariz. 112, 117 (App. 2008).  The Hospital instead "need only 'point out by specific reference to the relevant discovery that no evidence exist[s] to support an essential element of the [non-moving party's] claim.'"  *Id.* (quoting *Orme Sch.*, 166 Ariz. at 310).

**¶24**         We affirm the superior court's entry of summary judgment for the Hospital because Plaintiff failed to offer evidence—with qualified expert testimony or otherwise—sufficient to create a genuine issue of fact that the alleged negligence of Nurse B or other Hospital nurses was a substantial factor in Donald's death.

## II.    Conflicting Summary Judgment Rulings

**¶25**         Plaintiff also argues the superior court issued inconsistent rulings on the Hospital's punitive damages and causation motions for summary judgment.  This court, however, will affirm the superior court's grant of summary judgment if it is correct for any reason. *Rowland v. Great States Ins. Co.*, 199 Ariz. 577, 581, ¶ 6 (App. 2001).  And the superior court's decision was correct as explained above.

## CONCLUSION

¶26 We affirm the superior court's entry of summary judgment for the Hospital. As the prevailing party, we grant the Hospital its costs incurred on appeal upon compliance with ARCAP 21. Plaintiff's request for sanctions is denied.



AMY M. WOOD • Clerk of the Court
FILED: AA